Ms. Calderon. May it please the Court, my name is Rena Calderon. I'm representing Energy Security of America. And I think there are two issues. Are you related at all to the… Yes, I am. I wondered about that. Yes. What is the relationship? It's my father. Your father, I guess. You're going to have to speak up a little bit because our machine needs to record everything you're saying. Thank you. I think the issues are two. Is it a 12B1? Is it a timely claim? Is it a 12B6? As we've interpreted what the Court did below, it's looked to us that there was something substantive done because there's a 12B6 on the record. So it looks to us that the 12B1 and the 12… that there's a substantive ruling. Beyond the subject matter, jurisdiction, statute of limitations question… How did the government take something from you? Okay. What we're saying… They left you with your patent. You're free to pursue other ways to practice your patent. You're free to exclude any others from practicing your patent. I'm trying to figure out what they took from you. I think what we would say is that in a situation where you have the government funding R&D, okay? Yeah. And it's in an area where you really can't progress very easily as a factual matter, okay, without demonstration funding for the project or for the process. And that is a question of fact, we think, in the case. That if you have a situation where the… This is an area with a lot of government activity. That's certainly true. Yes. But let me try to get to your question more directly, Your Honor. If you have a situation where someone has been held off from competition in that arena and you have the situation with the government funding continue long enough so that there is data that's produced from projects that have been selected and that data becomes a technical standard in the field, then essentially by way of excluding someone from competition in the funding area, you also constructively divide them from permitting. I think that that's what we're trying to say. You think they gave you $13 million in order to prevent you… No, no. …from succeeding. No? No, no. Am I missing something? Okay. They gave us funding to do a demonstration unit at a certain scale. That scale was a process development unit. And there are different levels of scale-up in trying to push a project, push a process through to commercial application. So the next stage is a commercial-scale demonstration plant, near commercial-scale, near commercial-scale. That, again, it's a question of fact in the case, what that is, how big it is. It depends on things like can you marry it with a gas turbine of a certain size. But it's recognized that you can't really go from a small-scale or a smaller-scale process development unit to enter the market in a commercial sense unless you have something to show emissions and costs at a scale. Now, to be honest, I need to tell the court that what commercial-scale is, has changed over time. I mean, I don't think this fact was… I mean, I didn't mention this fact in the trial court, but it's a fact in the case. Energy prices were low during parts of this case. The law changed over time. If you look at the Clean Coal Technology Demonstration Program authorizing statute in the Non-Nuclear Act, we think it really looks to undertakings, to specific projects to show specific technologies, but it doesn't become like a subsidized form of technical standard setting. But as you move along in the field, the projects that were funded of a particular type of process becomes what the regulatory authorities would recognize. Let me ask you a question about the preferred technology which emerged in all of this, which I take it is called oxygen-blown entrained flow method. It's not entirely clear from my reading, but I take it that that was the preferred technology that DOE went for, rather than the cauldron technology. Is there something in the record that suggests that that has not now proven out? Is that right, or is that what they're doing? There's an issue on the life of the refractory that DOE has identified. You can actually find technical literature references on that, actually outside the statute of limitations period, to be honest. So yes, the answer is that there is a refractory life issue. Is that technology now being put aside? I don't think so. I think that they're continuing to work on the refractory problem. And they've identified it as something that's necessary for that process to be, or for oxygen-blown entrained flow. I want to just be very clear. Oxygen-blown entrained flow, there are more than... I don't want to make it sound like there's one particular vendor. It's been an accepted way of doing coal gasification for quite a long time. You can find two projects in the 1980s that do this type of process. But that's quite different from your technology. Yes. Let me say this to you, Ms. Carleton. I'm sympathetic with your frustrations and your father's frustration at not being recognized for the invention that he's come up with. But I'm having a little trouble quite figuring out what the obligation of the government is in a situation like this that would constitute a Fifth Amendment taking. For example, where I live, chicken manure is a big issue. And animal manure is a big issue all over, wherever animals are being raised. Let's assume I came up with a new invention for processing animal manure that would reduce the waste product, nitrogen and everything else that we're having to deal with. And I go to the EPA and I say, Hey, I've got this great new invention. We're going to fire it off. All right, whatever. And they look at me and they say, Well, that's interesting. Here's a little money. Show us how it will work. So I experiment with it. It doesn't come out perfect, but I'm making progress. And then they turn around and say, Well, we've decided to go in a different direction. I don't think that's a taking. I would agree with you. That's not a taking. Okay, that would not be a taking. How does your case essentially differ from that? Now, I didn't hypothesize I had a patent. Right. But you understand patents don't give you the right to do something. That's right. They only give you the right to prevent others from doing it. Right. The patent itself, there's another discussion, I think, about the underlying formula. So what I'm puzzling about, how does your case differ? In what essential way does your problem differ from the one I just gave you? I think there was an effort to prevent. I mean, it goes beyond, in our case, an ordinary selection between an A and B process. Well, now, wait a minute. You said an effort to prevent. And that gets to a question I wanted to ask you directly. Are you alleging that there was some sort of a deliberate conspiracy on the part of the government to bankrupt your company or to harm your father in some way? No, no. There was nothing of that nature going on? No. I think it was more making it difficult to compete. I mean, for example, there are things alleged in the complaint that during the process development unit period, there were delays in providing funding that had not been obligated. Can you address the other aspect here, which is that 1993 seems to have been the time when any problem would have emerged, and that's a long time before you filed? It has seemed to us over time. I mean, there's a set of repeated things that have happened after 1993. But it's in 1993 that you're... That we put the claim. I mean, we put the claim there, understand? The reason we put the claim there is because we thought you have to show some... Now, when all the facts are present, it should give you the indication that you have to file your suit. In 1993, why isn't it there? Well, we set it in retrospect. In a sense, now we're in 2007, let's say, and we have this letter from the Office of Air Quality Planning and Standards. It comes to us and says it has a certain data requirement on process evaluation. It seems to us to be put to the same scale as other processes that were funded. So the question... And we have a denial in 2005 that we think was not appropriately done. So standing at 07, we kind of look back and we say, well, what has been happening over this period of time? And are the funding decisions that were made in 93, are those really funding decisions? Or are they... Do you have to sort of look at the overall impact of what the government has been doing by way of its public funding programs? Is it... Is what is going on a formal technical standard setting? Now, you know, the government, of course, can use the data for projects in whatever way it wishes to. The question becomes if they use the data in such a way to foreclose other process technology from entering the market by way of permitting, then do you really have something that rises to the level of the taking? And if there's a government decision to use previously funded process technology in a way that precludes other processes from entering the market. Now... You were not able to get private funding, I take it, because of market... We tried. For 16 years in this case, a real 16 years, let me tell you. I mean, I can... We could talk a long time about what it is to go in there... Is the Calderon process still in play? Is it still viable? Where are you now? Okay. We have subsequent patent improvements that we have not pled in this case because we set the claim in 93. So you're not going to plead something that has not yet... We haven't done that. If the case were re-amended, we'd probably ask for an amendment. We might look at... We also own property. It's a development unit that we own. We might consider adding that as a piece of property. That's not in the case at this point as far as we're concerned. It's been two patents. So... I'm sorry. I think I lost your question. You were going to ask me. Oh, you answered mine. I don't know if Judge Rader is... Art, would you like to save some of your rebuttal? Yes. It's Calderon. Thank you. Okay. Mr. O'Connell? May it please the Court? By my count, the complaint says nine separate times that the cause of action accrued in 1993. So the complaint was late by nine years. To the extent an accrual suspension argument is being made, the test is inherently unknowable. It's a very difficult test for a plaintiff to ever meet. What it essentially says is that nobody could know that this cause of action accrued. Here we've got pled in the complaint that DOE repeatedly denied the funding, that you can't build these projects without DOE funding, and that DOE was publicly stating that the technology was unfeasible. So it was known to a reasonable person back in the 1980s that it was likely that DOE was never going to fund their technology, and for that reason the cause of action accrued back by 1993, just as it says in the complaint. With respect to the 12B6 argument, the trial court cited the appropriate case law. The plaintiff's core complaint here is that DOE didn't fund their technology. There's never been a case where the government was held liable for a taking, for failure to give people grants. It would essentially force the government to fund an experimental technology under the guise of a takings claim. Not yet, anyway. Correct, not yet. As the trial court correctly said, we're dealing with property here where there's no affirmative constraint on it of any kind. The plaintiffs retained all of their bundles of sticks and their bundle of rights. They retained their right to exclude, to sell to other people. The trial court correctly discussed all of the appropriate case law that applies to this situation, cases like Allard and Mitchell Arms and Huntley, which stand for the proposition that when a plaintiff retains its property but only has its business expectations frustrated, there's no taking. Is there any remedy that someone in the Calderon's position would have, even assuming no taking? Is there any remedy available for a citizen who finds themselves in the position the Calderons are in? Well, one remedy that appears in the complaint is that they repeatedly went to Congress, essentially went straight to Congress and repeatedly got earmarks from Congress for the technology. So that's certainly one remedy that they availed themselves of here, Your Honor. You're suggesting there's no judicial remedy or no lawsuit that you're aware of? No legal theory? Well, the complaint, we argued this at the Court of Federal Claims, that since the complaints spent probably scores of paragraphs asserting that their technology was better than the technology that was selected, it was kind of reminiscent of a bid protest filed 20 years after the fact, and it doesn't seem to be a settled question of law as to whether one of these grants can be protested at the Court of Federal Claims, although apparently there was a case within the last few months where the Court of Federal Claims has taken jurisdiction over such a case, but I don't believe this court has ever passed on that issue. Could you elaborate just a moment longer on that? The Court of Federal Claims has a case involving the denial of a grant? Yes. Isn't that interesting? Yes, it's Judge Damage, and I believe the name of the case is Ozdemir, issued in October, and it's a case that hasn't been decided on the merits yet, but a pro se plaintiff who was denied a grant filed a protest in the Court of Federal Claims of the denial of the grant, and the case is under consideration at the Court. Are you listening, Ms. Calderon? I'm listening. And as I say, the case is under consideration, and certainly the Department of Justice is not necessarily endorsing that result, Your Honor. Okay. And if there's no other questions, I'd ask the Court to affirm the trial court's opinion. Thank you, Mr. O'Connell. Ms. Calderon, you have time remaining. I just want to be available for the Court's questions if there are any additional ones. I have no further questions. Thank you, Ms. Calderon.